**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) <br> ) |
| FORT HILL SQUARE ASSOCIATES, and FORT HILL SQUARE PHASE 2 ASSOCIATES, | ) Chapter 11 <br> ) Case Nos. 04-13855-JNF <br> )     and 04-13857-JNF <br> ) |
| Debtors. | ) (Jointly Administered) <br> ) |

**MOTION OF THE DEBTORS TO DISQUALIFY IP COMPANY, L.L.C. AND BOSTON FUNDING, L.L.C. FROM VOTING ON THE BASIS OF BAD FAITH**

The Debtors, Fort Hill Square Associates and Fort Hill Square Phase 2 Associates ("Fort Hill" or the "Debtors"), move that this Court enter an Order designating any claims acquired by IP Company, L.L.C. ("IP Company") and those claims acquired by Boston Funding, L.L.C. ("Boston Funding") be disqualified from voting, pursuant to 11 U.S.C. 1126(e), on the basis that such claims were acquired by IP Company and Boston Funding in bad faith solely for purposes of defeating the Debtors' Plan of Reorganization and for no purpose recognized as legitimate under the Bankruptcy Code. As grounds for this motion, the Debtors state that Tishman Speyer Properties ("Tishman Speyer") and its affiliates Boston Funding and IP Company, L.L.C. ("IP Company")[1] have been acting in concert for the purpose of seizing control of the Debtors' assets. In carrying out this scheme, Boston Funding, IP Company and Tishman Speyer have engaged in a course of conduct directed at undermining the Debtors' reorganization efforts, which improper conduct has included, among other things, purchasing claims solely for the purpose of

---

[1] Tishman Speyer is the asset manager of IP Company, and IP Company has acknowledged Boston Funding as its affiliate. [Galiano Deposition pp. 6-10, and IP Company Motion to Dismiss (Docket No. 17), Paragraph 22.]

1

defeating the Plan, direct contact with unsecured creditors in violation of the July 19, 2004 Order, offering improper inducements to creditors to obtain their support, and engaging in a campaign of misinformation.[2] Based upon the foregoing, IP Company and Boston Funding should be disqualified from voting any acquired claims since those claims were acquired in bad faith solely for the purpose of defeating the Debtors' Plan, gaining a competitive advantage for Tishman Speyer in the Boston real estate market, and for no purpose recognized as legitimate under the Bankruptcy Code.

      In further support of this motion, the Debtors state as follows:

      1.     IP Company and Boston Funding are affiliates of each other and are affiliates of Tishman Speyer. Sometime prior to April of 2004, Tishman Speyer decided to embark on a course of conduct the purpose of which was to seize ownership and control of the Debtors' assets commonly known as One and Two International Place ("International Place"). While the Debtors' are not privy as to what motivated Tishman Speyer to launch its hostile attempt to seize ownership and control of International Place, the Debtors believe that Tishman Speyer's motivation included a desire to obtain ownership and control over one of the premier locations within the City of Boston and to obtain a dominant position in the Financial District for the City of Boston by controlling two of the premier locations in Fort Hill Square, being International Place and 125 High Street, property already owned and managed by Tishman Speyer.

      2.     Accordingly, in effectuating its plan, on or about April 2, 2004, Tishman Speyer through its affiliate IP Company acquired from Teachers Insurance and Annuity Association of America ("TIAA") certain notes described as Mortgage Note Phase 1 and

---

[2] In further support of their motion, the Debtors incorporate the allegations contained within the Debtors' Motion to Extend Period of Time Within Which They May Solicit Acceptances of Their Plan of Reorganization.

Mortgage Note Phase 2, each dated February 22, 1993, and related loan documents including certain agreements which granted TIAA a mortgage on International Place and a security interest in certain of its assets. At the time IP Company acquired the TIAA loan, IP Company projected that the Debtors would be in monetary default and that the loan documents would provide Tishman Speyer, through IP Company, with the opportunity to obtain ownership and control of International Place. [See Motion to Dismiss (Docket No. 17), Paragraphs 10, 11 and 14.]

3. Additionally, as part of its plan to seize ownership and control of International Place, Tishman Speyer caused Boston Funding to be formed on May 4, 2004. The purpose of forming Boston Funding was to have a shell corporation available to acquire claims against the Debtors so as to control and defeat any bankruptcy proceedings initiated by the Debtors.[3]

4. On May 7, 2004, by reason of Tishman Speyer's actions, the Debtors were forced to file proceedings under Chapter 11 of the United States Bankruptcy Code so as to be able to restructure their debt and obtain protection against the hostile actions being taken by Tishman Speyer and its affiliate, IP Company.

5. Immediately upon the Debtors filing their Chapter 11 cases, Boston Funding began soliciting and acquiring claims of the creditors of the Debtors. It is believed that Boston Funding acquired the claims of Nstar, Structuretone, and Greenberg Traurig. Boston Funding acquired those claims solely for the purpose of acquiring sufficient votes to be able to block any anticipated Plan of Reorganization that would be filed by the Debtors.

---

[3] Boston Funding was formed prior to the commencement of the Debtors' cases and, obviously, in anticipation of the Debtors being forced into a Chapter 11 proceeding.

6. Further, Boston funding did not acquire those claims so as to assist IP Company in the collection of its debt, but as part of the hostile takeover attempt being effectuated by Tishman Speyer to obtain control of the Debtors' assets.

7. Having purchased claims through Boston Funding in an amount which Tishman Speyer believed to be sufficient to defeat any Plan of Reorganization, Tishman Speyer then caused IP Company to engage in a course of activities to harass the Debtors and divert the Debtors' attention from their reorganization efforts. These tactics included the filing of a Motion to Dismiss, which IP Company knew had little legal or factual basis, a Motion to Terminate Exclusivity, and objections to the Debtors' efforts to enter into leases.[4]

8. On July 19, 2004, in connection with the Motion by IP Company to Terminate Exclusivity, the Debtors agreed to an Order which, in substance, resulted in the withdrawal by IP Company of its Motion to Terminate Exclusivity, in consideration for which IP Company would be permitted to speak to the Creditors' Committee, with its counsel present, to advise the Committee as to an alternative Plan of Reorganization. The July 19, 2004 Order did not permit IP Company to generally solicit the Debtors' creditors and, in fact, continued the prohibition against direct contact with the Debtors' creditors, except through the Committee with Committee's counsel present.

9. Since July 19, 2004, representatives of Tishman Speyer and IP Company have engaged in a course of conduct to undermine the Debtors' reorganization efforts and to induce or intimidate the Debtors' creditors to support IP Company/Tishman Speyer in their efforts to gain control of the Debtors' assets.

---

[4] The Debtors believe that IP Company's objection to the leases as below market was pretextual and that IP Company's real purpose in objecting to the leases was an effort to delay the leasing process so that when Tishman Speyer would obtain ownership and control of the property.

10. The Debtors believe this course of conduct has included, among other things, statements to the various members of the Creditors' Committee, in substance, that Tishman Speyer will take care of its friends and remember its enemies. Those statements were clear threats to the creditors that if they did not join and support Tishman Speyer in its efforts against the Debtors, then Tishman Speyer would retaliate against those creditors upon seizing International Place by terminating those creditors' contracts. Additionally, Tishman Speyer made it clear that any of the Debtors' creditors who failed to join with Tishman Speyer would not be viewed favorably as far as any other properties owned or controlled by Tishman Speyer.[5]

11. On information and belief, the Debtors believe that representatives of IP Company and Tishman Speyer have offered to members of the Committee to protect them against any downside risk should the Committee support IP Company, and in spite of IP Company's opposition, the Debtors succeeded with their Plan of Reorganization.

12. In addition to all of the foregoing, representatives of Tishman Speyer have engaged in a campaign of misinformation concerning the Debtors' reorganization efforts and the likelihood of the Debtors' success in order to further intimidate and dissuade creditors from supporting the Debtors.

13. Most recently, this campaign of misinformation has manifested itself by statements by counsel to IP Company that the Debtors are unable to obtain funding for their Plan of Reorganization, and that the Debtors' negotiations with their Lender would

---

[5] An example of this conduct with respect to creditors involved Northeast Securities. Northeast Securities is a member of the Creditors' Committee and a significant creditor of the Debtors. Many months ago, in response to a request for proposals, Northeast made a bid to operate security functions at 125 High Street. While that bid was to be awarded some time ago, it has not as yet been awarded. The Debtors believe that Tishman Speyer is delaying the awarding of that bid as an inducement to Northeast Securities to support IP Company and Tishman Speyer in their efforts against the Debtors.

at best result in a "soft commitment" with numerous unresolved contingencies. Representatives of IP Company also disseminated information that the Debtors' majority partner would under absolutely no condition give support to Debtors' Plan of Reorganization. Further, the representatives of IP Company represented that they were in constant contact, both with the Debtors' potential Investor/Lender and with the majority partner, and that they were receiving current updates as to the negotiations.

14. Obviously, the purpose of these statements by the representatives of Tishman Speyer was to undermine the creditors' confidence in the Debtors' efforts to reorganize and to create an atmosphere of uncertainty and fear among the creditors so that, coupled with the economic inducements, those creditors would join in support of Tishman Speyer's efforts to defeat the Debtors' reorganization efforts.

15. The statements by the representatives of Tishman Speyer or IP Company to the Committee were false. The Debtors have been assured by their Lender/Investor that there has been no discussions with Tishman Speyer or any representative of Tishman Speyer. The Lender/Investor has further advised the Debtors that it is aware that any such contact would be in direct violation of its Confidentiality Agreement with the Debtors, and the Lender/Investor has not and will not violate the Confidentiality Agreement. Furthermore, any contact by the Debtors' majority partner with Tishman Speyer and any such commitment by that partner to act in the manner being represented by Tishman Speyer would be in violation of that partner's fiduciary duty to its partners and the Debtors. The Debtors have been assured by their majority partner that it is not acting in breach of its fiduciary duty, that it has not made any commitments to Tishman Speyer and has remained open to the Debtors' Plan of Reorganization.

16. Clearly, IP Company and Boston Funding's purchase of claims was done in furtherance of this overall scheme and is tainted by the concerted efforts by Tishman Speyer, IP Company and Boston Funding to undermine the Debtors' Chapter 11 proceedings. Accordingly, the claims acquired by Boston Funding were acquired in bad faith as part of this improper conduct and for no purpose recognized as legitimate under the Bankruptcy Code.

17. Accordingly, IP Company and Boston Funding should be disqualified from voting in connection with the Debtors' Plan of Reorganization, or any Plan.

## ARGUMENT

### BOSTON FUNDING SHOULD BE DESIGNATED AS ACTING IN BAD FAITH.

18. Section 1126(e) of the Bankruptcy Code authorizes the Court to "designate" the ballots of "any entity whose acceptance or rejection of [the] plan was not in good faith, or was not solicited or procured in good faith." *See In re Allegheny Intern, Inc.*, 118 B.R. 282, 287 (Bankr. W.D. Pa. 1990). Although the Bankruptcy Code does not define "good faith," the decisions make clear that the gravamen of any inquiry is whether the purchase is in aid of the purchaser's interest as a creditor, or instead, serves some ulterior purpose. The Courts have identified various factors warranting a finding of bad faith, including such motivation as an intent to defeat a competitor's reorganization. The commonality among all the factors is that the motivation for the creditor's action was something other than serving a legitimate purpose under the Code.

19. The general rule is that when the purchase of a claim is in aid of an interest other than the interest of a creditor in his or her role as a creditor, the purchase may amount to bad faith. *See In re P-R Holdings Corp.*, 147 F.2d 895, 897 (2nd Cir.

7

1945) (interpreting § 203 of the Bankruptcy Act, the precursor to §1126); *In re Dune Deck Owners Corp.*, 175 B.R. 839, 845 (Bankr. S.D. NY 1995); *In re Gilbert*, 104 B.R. 206, 216 (Bankr. W.D. Mo. 1989; *In re McLeod Co., Inc.*, 63 B.R. 654, 655 (Bankr. S.D. Ohio 1986).

20. As noted in Allegheny *Intern, Inc.*, *supra*, at 290, a third party who chooses to become a creditor, should not have veto control over the reorganization process. Unquestionably, Boston Funding is acting in concert with IP Company and Tishman Speyer for the purpose of defeating the Debtors' Plan of Reorganization. Boston Funding is not acting to assist IP Company in the collection of its debt, but in furtherance of Tishman Speyer's scheme to seize ownership and control of the Debtors' assets and thereby obtain ownership and control of two of the premier office locations within the Boston Financial District.

21. IP Company and Boston Funding's motives are not only outside the realm of a creditor's interest, it clearly has been acting in bad faith. IP Company and Boston Funding's actions cannot be viewed in a vacuum, but must be viewed in the context of the overall conduct by Tishman Speyer. When seen in that context, there can be little doubt that IP Company and Boston Funding's motivation is outside of the realm of a creditor's interest and falls squarely within the prohibited conduct. *See In re Federal Support Co.*, 259 F.2d 17, 19 (4th Cir. 1988); *In re Landing Associates Ltd.*, 157 B.R. 791, 802 (Bankr. W.D. Tex. 1993); and *In re McLeod*, 63 B.R. 654, 656 (Bankr. S.D. Ohio 1986).

22. As indicated, the gravamen of the inquiries into good faith is motivation of the third party in purchasing the claims. If the purchase is motivated by a self-interest to

protect an existing claim, no bad faith may be found. However, if a claim purchaser casts its vote solely for an ulterior purpose, e.g. for the purpose of "advancing the interest of a competing business," its vote is, per se, in bad faith. *In Re SPM Manufacturing Corp.*, 984 F.2d 1305, 1317 (1st Cir. 1993) ("The good faith requirement bars creditors from casting their votes for ulterior motives, such as coercing a higher payment from the debtor's estate, pure malice, and advancing the interest of a competing business"); *In re Federal Support Co.*, 859 F.2d 17, 19 (4th Cir. 1988) ("A creditor may not case his vote for an ulterior purpose and expect to have it countered"); and *In re McLeod*, 63 B.R. 654, 656 (Bank. S.D. Ohio 1986) ("Votes cast for 'the ulterior purpose of destroying or injuring debtor in its business so that the interest of a competing business could be furthered' were in bad faith").

23. Certainly, under the circumstances, it cannot be stated that IP Company and Boston Funding purchased the claims of creditors "out of legitimate concern to protect its interest as a creditor," but rather to advance the interest of Tishman Speyer in acquiring the Debtors' assets.

24. It would be difficult, if not impossible, for Tishman Speyer and its affiliates IP Company and Boston Funding to argue that its motivation was other than to obtain ownership and control over International Place.

25. It would appear that IP Company purchased the debt for approximately $600 million, which was approximately what it valued the property to be worth. Further, based upon its own statements, it appears that IP Company purchased the debt with an expectation that the Debtors would be unable to meet their monetary obligations and be soon in default of their obligations. [See Motion to Dismiss (Docket No. 17), Paragraphs

9

10, 11 and 14.] Thus, the only motivation for IP Company in acquiring the debt was to utilize it for the purposes of acquiring the property. There was no legitimate creditor's interest in purchasing the debt. Certainly, the concerted conduct by IP Company, Tishman Speyer and Boston Funding would indicate that their intent is not to recover on their secured claims, but to use the TIAA Notes and the purchased claims as a means of obtaining ownership and control over the Debtors' assets.

26. Accordingly, neither IP Company nor Boston Funding can offer a legitimate creditor motive for the purpose of claims, and because the evidence is overwhelming that Boston Funding and IP Company were acting in concert with Tishman Speyer in furtherance of ulterior purposes to defeat the Debtors' Plan of Reorganization and to seize control of the Debtors' assets, the claims purchased by IP Company and Boston Funding must be disqualified from voting.

WHEREFORE, the Debtors, Fort Hill Square Associates and Fort Hill Square Phase 2 Associates, respectfully pray that this Court enter an order disqualifying IP Company, L.L.C. and Boston Funding, L.L.C. from casting any votes in connection with

confirmation of the Debtors' Plan of Reorganization, and for such other and further relief as this Court deems just and proper.

                                                Respectfully submitted,

                                                FORT HILL SQUARE ASSOCIATES
                                                AND FORT HILL SQUARE PHASE 2
                                                ASSOCIATES

                                                By their Attorneys,
                                                HANIFY & KING
                                                Professional Corporation

Dated: September 7, 2004          /s/ Harold B. Murphy
                                                Charles R. Bennett, Jr. (BBO #037380)
                                                Harold B. Murphy (BBO #362610)
                                                HANIFY & KING
                                                Professional Corporation
                                                One Beacon Street
                                                Boston, MA  02108
                                                (617) 423-0400
                                                Fax:   (617) 556-8985

413667